### THE HOWARD B. PECK.

### ENGSTROM *v.* THE HOWARD B. PECK.

*(District Court, D. Connecticut. November 23, 1891.)*

1. COLLISION—VESSEL AT ANCHOR—FAILURE TO SHOW TORCH.
   Where a vessel at anchor in the night-time can see the lights of an approaching vessel, there is no reason to suppose that her own lights, properly set and burning brightly, cannot be seen; and hence her failure to display a torch before the approaching vessel collides with her is not such a fault as will entitle the colliding vessel, confessedly in fault, to a division of the damages.

2. SAME—FAILURE TO SHIFT HELM.
   The failure of the anchored vessel, which was lying in a tide-way, to put her helm hard over when the collision appeared imminent, is not such a fault as to call for a division of the damages, where it is not shown that the swing to result from such shifting of the helm in the tide-way would have carried her clear of the colliding vessel.

In Admiralty. On libel for collision.
*J. Langdon Ward*, for libelant.
*Samuel Park*, for claimant.

SHIPMAN, J. This is a libel *in rem* against the schooner Howard B. Peck to recover damages to the bark Storcken occasioned by a collision in Hampton Roads on March 26, 1891. The owners of the schooner filed a cross-libel. The Swedish bark Storcken reached Hampton Roads, on its way to New York, on March 18, 1891, and anchored in about the middle of the channel, in the same place where the collision occurred. On March 26th she was anchored with a starboard anchor and 45 fathoms of chain. For four days vessels bound northward had encountered head winds, and on March 26th there was an impending easterly storm. The wind was E. N. E., blowing hard. The evening was cloudy, with dark clouds passing by, but without rain or fog, until after

9 o'clock. Lights could be seen distinctly. By that evening, quite a large number of vessels, how many did not appear, had come into Hampton Roads to avoid the coming storm. A number of vessels were anchored near the Storcken. The three-masted schooner Howard B. Peck, on her way from Georgia to New London, came also into the Roads on that evening seeking refuge. She carried three fore and aft sails, three jibs, and a fore stay-sail, all of which were set when she was coming up the bay. She took in her spanker about one and one-third miles from Fortress Monroe. Her lights were properly set and burning. The tide was about half flood, with a probable velocity of three miles per hour, and flowing in a west-south-westerly direction. As she reached the water battery, two large steamers met there, and showed their search-lights just ahead of the Peck. The effect of these electric lights was to temporarily blind the captain of the Peck as to objects beyond the glare of the lights. When the search-light went down, he saw a vessel, close by, on his port bow. The steamers again showed their search-lights, and showed enough to see that there were many lights there. In the language of the captain of the Peck, "there were quantities of stuff in the way there,—vessels or something else." As soon as the vessel which was on his port bow was passed, the captain of the Peck starboarded his wheel, so as to cross the channel. He did not diminish the speed of his vessel, which had wind and tide with her. In a few minutes the mate reported a light on the Peck's starboard bow, and immediately after another light close to the first. The Peck starboarded her wheel, and forthwith struck the bark in the after part of her fore-rigging, carried away her jib-boom, and did other damage, caused her to drag her anchor, passed across her bow, scraped along her starboard side, and anchored astern. After the collision the Peck's captain found that "the place was full of vessels." The collision took place at 7:45 p. m. The Storcken had a proper anchor light, properly set and brightly burning. She was riding at anchor, heading E. N. E. The carpenter was on deck, keeping the anchor watch; the rest of the crew were below. The captain was on deck. He saw the Peck's red and green lights about two points on the Storcken's port bow, and thought that she was about half a mile away. Immediately after the two lights were sighted he saw that the red light was shut in. He looked at the Peck for two or three minutes, and saw that she was about to collide with his vessel. He called the hands to come on deck, but by the time they came the collision had occurred. The Storcken was dragging her anchor; he let go the port anchor, and paid out 45 fathoms of chain. At the turn of the tide he tried to take in chain, but did not accomplish much, and fouled with the four-masted schooner Carrie Bronson, sustaining additional damage. The Storcken was not anchored in a dangerous place. It was rather unusual to be so near the middle of the channel, but that part of the channel, on that day and evening, was full of vessels, which had sought refuge from the coming storm.

Divers grounds of negligence on the part of the Howard B. Peck were claimed by the libelant, but it is not necessary to examine them, be-

cause the claimant conceded that she was in fault for going so fast, and that she should have reduced her speed when she found that it was dangerous to go ahead, and turned to go across the channel. Conceding negligence on the part of the Peck, her counsel invoked the aid of the principle of law that "errors committed by one of two vessels approaching each other from opposite directions do not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent collision," (*The Sunnyside*, 91 U. S. 208;) and insisted that it was the duty of the Storcken to show a torch, to pay out chain, or shift her helm, in order to avoid the coming collision, and therefore that the damages should be divided. The Storcken could see the lights on board the approaching schooner, and had no reason to suppose that her own lights were invisible or that there was occasion for a torch. The hands were promptly summoned to pay out chain, but the injury happened before they could get on deck, and whether the collision could have been avoided by shifting the helm, after the captain became convinced that the approaching vessel was not apparently intending to change her course, is not certain. If the helm had been shifted from amidships to hard either way, it would have changed the position of the Storcken 50 feet, and she would have swung in an arc of a circle of which the anchor would have been the center and the chain the radius. Whether she could have thereby avoided the Peck, which was rapidly coming down nearly at right angles with her, nobody can tell. Perhaps she could, but a court is not called upon to divide the damages between an anchored vessel, which is acting in accordance with the rules, and is surprised by the approach of a vessel in motion, which is confessedly in fault, upon the surmise that, if the anchored vessel had shifted its helm, it might have escaped the collision. Let there be a decree for the libelant, with costs, and for a reference to a commissioner in regard to the amount of damages, and a dismissal of the cross-libel.